**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

BRENDA LEE SENEY,                        )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )         Civil Action No. 15-251-RGA/MPT
                                          )
CAROLYN W. COLVIN,                        )
Acting Commissioner of                    )
Social Security,                          )
                                          )
              Defendant.                  )

**REPORT AND RECOMMENDATION**

**I.      INTRODUCTION**

This action arises from the denial of plaintiff's claims for Social Security benefits.

On February 3, 2011, plaintiff filed a Title II application for a period of disability and

disability insurance benefits ("DIB").  D.I. 9 at 29.  Plaintiff also filed a Title XVI

application for supplemental security income ("SSI") on February 23, 2011.  *Id.*  In both

applications, she alleged disability beginning June 30, 2008, due to multiple sclerosis

("MS"), overactive bladder, hemangioma, left cerebrotontine angle arachnoids cyst,

optic neuropathy, and partial blindness in the right eye.  *Id.* at 216.  The claims were

denied, initially and upon reconsideration, resulting in plaintiff requesting a hearing

before an Administrative Law Judge ("ALJ").  *Id.* at 29.  The hearing occurred on May

14, 2013.  *Id.* at 39.  At the hearing, testimony was provided by plaintiff and a vocational

expert, Dr. James M. Ryan ("Dr. Ryan").  *Id.* at 41-64.  On June 11, 2013, ALJ Melvin D.

Benitz issued a written decision denying her claims.  *Id.* at 38.  Plaintiff requested an

appeal of the ALJ's decision by the Social Security Appeals Council shortly thereafter,

on June 25, 2013.  *Id.* at 24.  Following an extension granted on December 3, 2014, and

after considering newly introduced evidence concerning plaintiff's health condition, the

Appeals Council denied plaintiff's request for review on January 26, 2015.  *Id.* at 1-2,

20.  On March 20, 2015, plaintiff filed a timely appeal with the Court.  D.I. 2.  Presently

before the Court are the parties' cross-motions for summary judgment. D.I. 11; D.I. 15.

For the reasons that follow, the court will grant in part and deny in part plaintiff's motion

(D.I. 12) and grant in part and deny and part defendant's motion (D.I. 16).

## II.   BACKGROUND

Plaintiff was born on March 19, 1973.  D.I. 9 at 42.  She has a twelfth grade

education, and last worked in June 2007.  *Id.* at 43.  As of 2013, her only source of

income was through social services, such as cash, food stamps, and medicaid.  *Id.*  Her

past work includes employment in a retail warehouse, as a mail sorter, and in the fast

food industry.  *Id.* at 59.  All positions are considered unskilled labor positions, with no

transferrable skills.  *Id.*  Symptoms from her MS, including numbness and fatigue, led to

her alleged inability to work in 2008.  *Id.* at 29, 59-60.

### A.   Medical Evidence

#### 1.  Wilmington Neurology Consultants and Dr. Silversteen

Plaintiff was diagnosed with MS in June 2007, based on MRIs of the brain and

cervical and thoracic spine revealing demyelinating plaque compatible with MS.  D.I. 9

at 291.  In October 2007, plaintiff was evaluated by Sheria A. Hudson, MSN, NP-C

("Nurse Hudson"), at Wilmington Neurology Consultants, for tingling sensations in her

hands and feet, and shooting pain in her back and neck.  *Id.* at 285.  Upon examination,

2

Nurse Hudson noted intact vibratory, touch, and temperature sensations, with stable coordination and gait. *Id.* at 286. Plaintiff began a regimen of Rebif injections. *Id.* She was re-examined after six weeks of treatment, and no abnormal findings were reported. *Id.* at 283.

Plaintiff returned to Wilmington Neurology Consultants on July 10, 2008, complaining of soreness due to the Rebif injections. *Id.* at 281. The assessment noted the relapsing MS as stable. *Id.* Six months later, on January 8, 2009, during a follow up visit, she complained of intermittent pain in her neck and back, finger numbness, and dizziness. *Id.* at 279. Plaintiff also reported that she was unemployed, but actively seeking a job. *Id.*

Plaintiff saw Nurse Hudson on June 24, 2009, and advised of a recent fall, caused by leg weakness. *Id.* at 275-76. On examination, Nurse Hudson noted normal facial sensation, clear and fluent speech, and fully intact bilateral upper extremity strength. *Id.* at 275. Plaintiff could balance on each foot individually with minimal difficulty, and had a negative Romberg test, but exhibited a mild limp. *Id.* at 275-76. Plaintiff was working in a volunteer program for social services that allowed her to maintain her day care benefits and other services. *Id.* at 275. This work included moving furniture out of an apartment complex. *Id.*

Three months later, plaintiff was evaluated by Dr. Lee Dresser, also with Wilmington Neurology. *Id.* at 273. Dr. Dresser noted recent exacerbation of the MS symptoms and intolerance of Rebif. *Id.* When plaintiff returned for her regularly scheduled follow up on November 17, 2009, the only notable change in her condition was a slower gait. *Id.* at 271. She told Nurse Hudson she planned to file for social

3

security disability.  *Id.* at 271.

On January 28, 2010, plaintiff reported that she was more forgetful.  *Id.* at 270. Dr. Dresser's physical examination noted normal extraocular movements, facial and upper extremity strength, and near normal strength in the lower extremities.  *Id.*  Dr. Dresser diagnosed MS with "possibly associated cognitive problems."  *Id.*  He advised plaintiff to return in four months, and to report any new neurologic symptoms or worsening cognitive problems.  *Id.*  Plaintiff returned to Dr. Dresser on May 27, 2010. *Id.* at 269.  Her condition was stable with similar strength in the upper and lower extremities and a steady gait.  *Id.*  Plaintiff returned to Dr. Dresser one month later, on June 30, 2010, complaining of persistent numbness of the left lateral foot.  *Id.* at 268. Her hepatic hemangioma had increased.  *Id.*  Dr. Dresser continued with the Rebif injections, and ordered a urology evaluation.  *Id.*

Plaintiff was hospitalized with vertigo in October 2010.  *Id.* at 267.  She returned to Dr. Dresser on November 30, 2010, who diagnosed low potassium and calcium, and prescribed supplements.  *Id.*  Plaintiff complained of urinary incontinence with urgency and left-sided numbness.  *Id.*  The physician's impressions were "multiple sclerosis with possibly associated cognitive problems" and "hypocalcemia and hypokalemia of unclear etiology."  *Id.*

Dr. Dresser's notes for plaintiff's April 5, 2011 visit indicated a "pronounced right limp," with lower extremity weakness, worse on the left, but good upper extremity strength bilaterally.  *Id.* at 366.  Plaintiff's speech was clear.  *Id.*  His impression was MS versus neuromyelitis optica, and he referred plaintiff to Dr. Silversteen for a second opinion.  *Id.*  Dr. Dresser continued the Rebif injections, and prescribed Balcofen for

4

muscle spasms.  *Id.*

Plaintiff reported to Dr. Silversteen on May 31, 2011.  *Id.* at 402.  He noted the following symptoms:  episodes of numbness in the upper and lower extremities, intermittent parethesias and dysethesias, and cramping of hand and calf muscles.  *Id.* Romberg test showed mild sway.  *Id.* at 404.  His assessment was seronegative neuromyelitis optica ("NMO").  *Id.*  Dr. Silversteen discontinued the Rebif injections.  *Id.* On June 7, 2011, based on review of her MRI, Dr. Silversteen diagnosed seronegative neuromyelitis versus MS, because the test was not fully consistent with NMO.[1]  *Id.* at 400-01.  He prescribed Cellcept, since it treats both MS and NMO.  *Id.*  Dr. Silversteen also noted plaintiff's walk time was 9.1 seconds for a 25 foot distance without assistance, and Romberg testing revealed mild sway.  *Id.*

Dr. Silversteen submitted a Department of Health and Social Services form dated June 7, 2011.  D.I. 9 at 406-07.  The form indicated plaintiff could not sit/stand for more than four hours, could not climb a flight of stairs or walk 100 yards without pause, could not participate in small group settings, or in training or education programs, and could only lift up to five pounds.  *Id.* at 407.

Plaintiff returned to Dr. Silversteen's office on August 8, 2011.  He recorded "no new symptoms."  *Id.* at 423.  Plaintiff experienced some mild gastrointestinal symptoms with the generic Cellcept.  *Id.* at 424.  She also had bladder urgency, nocturia, fatigue, and depression.  *Id.*  Dr. Silversteen recommended counseling and medication to treat the depression.  *Id.*  He continued the Cellcept, prescribed Senna for her

---

[1] Plaintiff had "predominate cord inflammation" which is consistent with NMO.

5

gastrointestinal problems, increased her Oxybutynin, and prescribed Wellbutrin XL for her depression.  *Id.* at 426.

Plaintiff returned to Dr. Silversteen on January 5, 2012.  *Id.* at 462.  The doctor noted plaintiff was not tolerating Cellcept.  *Id.*  She had lost weight, was losing hair, and continued to show signs of depression.  *Id.*  She advised she was not taking Cellcept everyday due to the side effects, and that the urinary urgency continued.  *Id.*  Dr. Silversteen discontinued Cellcept and prescribed Gilenya.  *Id.* at 465.  He referred plaintiff for her depression and anxiety.  *Id.*

On February 13, 2012, Dr. Silversteen completed a medical source statement. *Id.* at 473.  He listed the following symptoms:  fatigue, balance difficulties, poor coordination, weakness, unstable walking, numbness, bladder and bowel problems, sensitivity to heat, difficulty remembering, depression, and double or blurred vision.  *Id.* He noted plaintiff had significant and persistent disorganization of motor function due to decreased dexterity, strength, and coordination of the hands and arms, and motor fatigue.  *Id.* at 474.  He reported plaintiff's impairments were "reasonably consistent" with the symptoms and functional limitations from MS.  *Id.*  Because of the frequency of her symptoms, he concluded plaintiff was unable to tolerate even "'low stress' jobs" due to her significant disability and depression.  *Id.* at 475.  Dr. Silversteen noted plaintiff could not walk a full city block, could only sit for fifteen minutes at a time, and could only stand for five minutes at a time.  *Id.* at 475-76.  He also reported plaintiff could only sit for about 2 hours, and stand/walk for less than 2 hours in an 8-hour work day, which would require a job that permitted her to shift from sitting to standing or walking at will, with unscheduled breaks every hour, and rest for thirty minutes at a time.  *Id.*  Dr.

Silversteen found plaintiff could occasionally lift less than ten pounds, rarely lift ten pounds, and never lift twenty or more pounds, never twist, stoop, crouch, climb ladders, or climb stairs, and would likely be absent more than four days per month.  *Id.* at 479.

Plaintiff returned to Dr. Silversteen for a follow up on April 16, 2012.  *Id.* at 500. He noted the repeat MRI in January 2012 showed enhancement of the optic nerves with diffuse involvement of the C/T spine and increase in the midbrain.  *Id.*  He recommended IV steroids and Gilenya, but plaintiff refused, so she was prescribed Rebif against the doctor's recommendation.  *Id.* at 500-01.  Dr. Silversteen further reported plaintiff's weight was stable, and her blurred vision, balance issues, and reduced stamina continued.  *Id.* at 501.  She returned to Dr. Silversteen on July 19, 2012.  The doctor reported the only new issues to be "some burning" in her lower legs. *Id.* at 504.  Plaintiff also complained of consistent hair and weight loss, and the doctor noted significant depression.  *Id.*  Dr. Silversteen prescribed Neurontin for leg dysesthesias.  *Id.* at 507.  Plaintiff returned for a follow up on November 8, 2012, and the doctor reported no new symptoms.  *Id.* at 529.

On May 6, 2013, Dr. Silversteen completed a Department of Health and Social Services form indicating plaintiff required the presence of another individual in the home to care for her.  *Id.* at 589-90.  He recorded plaintiff could not sit or stand up to four hours, climb a flight of stairs or walk 100 yards without pause, be punctual and keep a schedule, or participate in small group settings or training and education programs.  *Id.* at 590.  Plaintiff also functioned best in the morning, could demonstrate insight into problems, follow written and verbal directions, deal with constructive feedback, and lift between two to five pounds.  *Id.*

### 2.  Dr. Pasquale Fucci

Dr. Pasquale Fucci ("Dr. Fucci") has been plaintiff's primary care provider since the 1990's.  *Id.* at 237.  Plaintiff visited Dr. Fucci in January and March 2011.  *Id.* at 358-60.  His reports indicated blurry vision and frequent urination.  *Id.* at 358.  On May 5, 2011, he noted she was a good candidate for SSI Disability.  *Id.* at 388.  Dr. Fucci's exam on March 2, 2012 indicated absent posterior tibial pulses, and significant edema bilaterally with mild erythema of the right lower leg.  *Id.* at 576-77.  His report on April 10, 2012 noted plaintiff "ambulate[d] independently approximately 90% of the time," used a cane approximately 50% of the time, with her primary issue as fatigue.  He further noted there was "nothing to suggest an MS relapse."  *Id.* at 572.  On October 25, 2012, Dr. Fucci reported plaintiff was "generally looking good," and tolerating her medication "very well."  *Id.* at 568.

Dr. Fucci completed a medical source statement on October 25, 2012, and reported the following MS symptoms:  fatigue, balance problems, weakness, unstable walking, numbness, sensitivity to heat, difficulty remembering, depression, sensory disturbance, and shaking tremors.  *Id.* at 488-93.  He noted tremors in both legs resulting in sustained disturbance of gross and dexterous movement, and plaintiff's pain and fatigue were often severe enough to interfere with attention and concentration.  *Id.* at 489.  He further indicated plaintiff was "incapable of even 'low stress' jobs," unable to walk a city block, sit for 30 minutes at a time, stand for 10 minutes at a time, required walking assistance on occasion, could rarely lift less than 10 pounds, and never twist, stoop, crouch, or climb ladders or stairs.  *Id.* at 490-92.  He also noted she would "not be able to work."  *Id.* at 493.

8

Dr. Fucci's most recent report, dated March 14, 2013, noted plaintiff was losing weight (possibly due to stress), and had some muscle spasms and aches, although she related her MS was not acting up. *Id.* at 555. Her neurologic report indicated numbness and tingling, without abnormal balance, confusion, or headache. *Id.* at 556.

### 3. Eye Center of Delaware and Dr. Psaltis, OD

Records from the Eye Center of Delaware showed diagnoses of optic neuropathy O.D.[2] secondary to MS, MS, keratopathy secondary to dry eye syndrome, and glaucoma suspected in both eyes. *Id.* at 343-54, 408-14, 511-18. A report by Dr. John Psaltis on April 19, 2012 found O.D. glaucoma suspected, along with visual field defect. *Id.* at 380. A subsequent report by Dr. Psaltis, dated October 22, 2012, noted O.U.[3] retinopathy, as well as vitreous floaters/opacities, and glaucoma suspected in both eyes. *Id.* at 496. His most recent diagnosis on February 18, 2013, included glaucoma suspected, hyperopia, diplopia, astigmatism, vitreous floaters/opacities, and visual field defects in both eyes. *Id.* at 549-53.

### 4. Drs. Goldsmith, Schaffzin, and Titanji

Dr. Joyce Goldsmith ("Dr. Goldsmith"), a state agency medical consultant, reviewed the medical evidence in connection with plaintiff's initial application on June 28, 2011. *Id.* at 415-21. Dr. Goldsmith determined plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for at least two hours in a work day, and sit for about six hours. *Id.* at 416. Additionally, plaintiff could occasionally climb stairs, stoop, kneel, crouch, or crawl, but never balance, due to her MS and had a mild sway.

---

[2] O.D. is a medical abbreviation meaning right eye.
[3] O.U. is an medical abbreviation meaning both eyes.

*Id.* at 418.  Dr. Goldsmith found no manipulative, visual, or communicative limitations, and the only environmental limitation was to avoid all exposure to unprotected heights. *Id.* at 418-19.  On November 17, 2011, Dr. Schaffzin, another state agency physician, reviewed the medical record and affirmed Dr. Goldsmith's assessment, noting there were no new symptoms as of August 8, 2011, and the medical evidence did not support any significant increase in severity.  *Id.* at 437.

Dr. Rudolph Titanji, another state agency medical consultant, also reviewed the medical evidence on August 8, 2012.  *Id.* at 479-87.  His report concluded plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for at least two hours, and sit for about six hours.  *Id.* at 480.  Additionally, plaintiff could occasionally climb stairs, ladders, and balance, and frequently stoop, kneel, crouch, and crawl, and had no manipulative, visual, communicative, or environmental limitations.  *Id.* at 482-83. Dr. Titanji believed plaintiff's statements were partially credible based on the totality of the evidence.  *Id.* at 484.

### 5.  New Evidence

Additional evidence was presented to the Appeals Council on January 26, 2015. *Id.* at 5.  The additional evidence included MRIs of the cervical spine on July 19, 2013, May 2, 2014, and June 10, 2014.  *Id.* at 7-10, 591-94  The MRI from July 2013 showed some new lesions, but minimal degenerative change and no evidence to suggest an active demyelinating plaque.  *Id.* at 591-94.  There were urology records dated October 23, 2014, and records from Delaware Eye Center dated September 22, 2014 also provided.  *Id.* at 11-19.

### B.  Hearing Testimony

### 1.    Plaintiff's Testimony

At the May 14, 2013 hearing, plaintiff testified about her background, work history, and alleged disability.  *Id.* at 42-58.  She was 40 years old at the time of the hearing, and lived in Wilmington, Delaware with her five children.  *Id.* at 43.  She has a twelfth grade education, and her only income is through social services programs.  *Id.* She has not worked since June 2007, with her last position as a detail receiver at a Sears warehouse.  *Id.*  She described her job as being "on her feet all day," with responsibilities that included checking merchandise and for clerical errors, and moving paperwork.  *Id.* at 44.  She left this position due to her MS symptoms.  *Id.*

Plaintiff described how her symptoms restricted her ability to work.  *Id.*  She could not stand on her feet for eight hours due to weakness and cramping in her legs and feet, and could only sit for no more than a half an hour at a time.  *Id.* at 43, 45.  She experienced periods of numbness in her arms and legs, with consistent pain in the back of her legs, and a constant shooting pain in the back of her neck.  *Id.* at 46.  She could only walk "about a block," and uses a cane for support.  *Id.* at 47.

Concerning her daily activities, plaintiff testified she handles her personal hygienic needs and does the grocery shopping, although her husband provides the transportation and lifts heavy items.  *Id.* at 48-49.  She does all the cooking for her family, but occasionally requires aid from her children when opening jars and similar items.  *Id.* at 50.  She can perform simple activities, like laundry or washing the dishes, for about "15-20 minutes" before she requires a break.  *Id.*  When discussing the reasons for leaving her last job, she cited difficulty standing for long periods of time; however, she further testified she could not tolerate a job which required sitting for

extended periods of time.  *Id.* at 50-51.

Regarding her treatment, plaintiff related undergoing IV infusions, along with Rebif injections three times a week.  *Id.* at 52.  Rebif caused multiple side effects, including soreness and dizziness, with symptoms lasting "about an hour or so" immediately following an injection.  *Id.*  Symptoms of her MS included numbness and tingling in her fingers occurring one to two times a week.  *Id.* at 53.  She has partial vision in her right eye, which causes constant blurred vision.  *Id.* at 53-54.

Plaintiff testified she is five feet, eight inches tall and weighed 133 at the time of the hearing, having lost about seventeen pounds due to her symptoms and stress.  *Id.* at 54.  Her doctor prescribed medication to help gain weight.  *Id.*  Plaintiff explained her symptoms have exacerbated with "more weakness in the legs and . . . two more lesions in the neck."  *Id.* at 55.  She can only lift about five pounds, stand for two hours at a time, and sit for thirty minutes at a time.  *Id.* at 56.  Although separated from her husband, he provides financial support.  *Id.* at 56-57.

## 2. The Vocational Expert's Testimony

Dr. James Michael Ryan ("Dr. Ryan"), a vocational expert, testified regarding plaintiff's work history, skills and limitations, and the jobs available within her restrictions.  *Id.* at 59-64.  Plaintiff's past relevant work history includes as a material handler at a retail warehouse, mail sorter, and cleaning in the fast food industry.  *Id.* at 59.

The ALJ presented a hypothetical to Dr. Ryan of an individual having similar symptoms and limitations as plaintiff.  *Id.* at 60.  That hypothetical person was limited to

simple, unskilled level SVP 1 or 2 jobs,[4] of low stress, low concentration, low memory, no production rate, and no decision making or much judgment required. The positions also needed to allow the following restrictions: lifting ten pounds occasionally, with lesser amounts frequently, sitting for up to one hour and standing for five to thirty minutes, on an alternative or at will basis, for an eight hour workday, with no height, machinery and temperature and humidity extremes, no need for keen visual acuity and reasonable bathroom access. *Id.*

In response to the ALJ's hypothetical, Dr. Ryan identified the following jobs that fell within those restrictions and were at a SVP 2 level: finish machine tender, quality control worker and grading and sorting worker. Each job had an availability range of at least 31,000 positions nationally and 400 to 500 positions in the local economy.[5] *Id.* at 60-61. He testified that his list was not exhaustive. *Id.* at 60. Dr. Ryan also confirmed that, due to her limitations, plaintiff could not perform any of her past work. *Id.* at 62.

In response to the single question from plaintiff's attorney, which outlined the limitations contained in the medical source statement from Dr. Silversteen, Dr. Ryan responded such restrictions would prohibit plaintiff from substantial gainful activity. *Id.* at 62-63.

## C. The ALJ's Findings

---

[4] SVP is the abbreviation for Specific Vocational Preparation, which is the amount of time required by a typical worker to learn information, acquire techniques and develop the facility for average performance in a specific job-worker situation. SVP 1 involves only a short demonstration. SVP 2 is beyond short demonstration up to and including one month.

[5] The local economy was defined as the Delmarva Pennisula, with Dover, DE as the center of this area.

Based on the medical evidence and testimony, the ALJ determined plaintiff was not disabled, and therefore ineligible for DIB.  D.I. 9 at 31-38.  The ALJ's findings are summarized as follows:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since January 25, 2012 (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairment:  multiple sclerosis (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that due to her impairment, she would need simple routine unskilled jobs, consistent with a specific vocational preparation code of one or two in nature.  She would be able to attend tasks and schedules.  Jobs should be low concentration, stress and memory, meaning jobs with one or two-step tasks.  No production rate work.  Jobs that have no decision, changes in work setting, or much judgment to perform the work.  She could sit for one hour, stand for five to 30 minutes, consistently or on an alternate basis, eight hours a day, five days a week, or at will.  Due to the medication side effects, she should avoid heights, hazardous machinery, and temperature extremes.  Due to her visual deficiency, she would need a job that would not require keen visual acuity.  She would need a job that would allow ready access to a bathroom, should she need it.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on March 19, 1973 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

14

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

*Id.* at 31-38.

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties move for summary judgment.  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).  If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.  *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

This standard does not change merely because there are cross-motions for summary judgment.  *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).  Cross-motions for summary judgment:

are no more than a claim by each side that it alone is entitled to summary

15

> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

## B. Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not contain substantial evidence to support the ALJ's decision. The Commissioner's factual decisions are upheld if supported by substantial evidence. *See* 42 U.S.C. §§405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckle*, 806 F.2d 1185, 1190 (3d Cir. 1986). Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the decision nor re-weigh the evidence of record. *Monsour*, 806 F.2d at 1190. The court's review is limited to evidence actually presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).  Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Even if the court would have decided the case differently, it must defer to and affirm the ALJ so long as the decision is supported by substantial evidence. *Monsour*, 806 F.2d at 1190-91.

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision."  *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).  In *SEC v. Chenery Corp.*, the Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."  332 U.S. 194, 196 (1947).  "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  *Id.*  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.  *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001).  This court's review is limited to the four corners of the ALJ's decision.  *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).  In Social Security cases, the substantial evidence standard applies to motions

for summary judgment brought pursuant to FED. R. CIV. P. 56.  *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

IV.    **DISCUSSION**

A.    **Parties' Contentions**

Plaintiff contends that the ALJ erred as a matter of law in giving little weight to her treating physicians' opinions, and substantial weight to those of the state agency physicians.  D. I. 12 at 13-18.  Additionally, plaintiff argues the ALJ erred as a matter of law in assessing credibility.  *Id.* at 18.  Finally, plaintiff maintains new and material evidence shows the need for remand.  *Id.* at 21.

Defendant counters by arguing the standard for establishing disability pursuant to the act is stringent, and the ALJ followed the controlling regulations in evaluating the opinion evidence.  D.I. 16 at 6-7.  Further, defendant contends the ALJ followed the controlling regulations in evaluating the credibility of plaintiff's subjective complaints.  *Id.* at 13.  Finally, defendant maintains plaintiff failed to establish that remand pursuant to sentence six of 42 U.S.C. § 405(g) is warranted.  *Id.* at 16.

B.    **Disability Analysis**

Title II of the Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."  *Bowen*, 482 U.S. at 140.  To qualify for DIB, a claimant must establish disability prior to the date she was last insured.  *See* 20 C.F.R. §404.131.  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either

18

could result in death or has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §§ 423(d)(l)(A), 1382(c)(a)(3).  To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  If a finding of disability or non-disability can be made at any point in the sequential process, the review ends.  20 C.F.R. § 404.1520(a)(4).  At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity, and if so, a finding of non-disabled is required.  20 C.F.R. § 404.1520(a)(4)(I).  If the claimant is not so engaged, step two requires the Commissioner to determine whether the claimant is suffering from an impairment or a combination of impairments that is severe.  If no severe impairment or a combination thereof exists, a finding of non-disabled is required.  20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares them to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428.  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment, either singularly or in combination, fails to meet or medically

19

equal any listing, the analysis continues to steps four and five.  20 C.F.R. §

404.1520(e).  At step four, the Commissioner determines whether the claimant retains

the residual functional capacity to perform her past relevant work.  20 C.F.R. §

404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428.  A claimant's residual functional capacity

is "that which an individual is still able to do despite the limitations caused by [her]

impairment(s)."  *Fargnoli*, 247 F.3d at 40.  "The claimant bears the burden of

demonstrating an inability to return to [her] past relevant work."  *Plummer*, 186 F.3d at

428.

If the claimant is unable to return to her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude adjusting to

any other available work.  20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 427- 28.  At

this final step, the burden is on the Commissioner to show the claimant is capable of

performing other available work existing in significant national numbers and consistent

with the claimant's medical impairments, age, education, past work experience, and

RFC before denying disability benefits.  *Plummer*, 186 F.3d at 427-28.  In making this

determination, the ALJ must analyze the cumulative effect of all the claimant's

impairments and often seeks the assistance of a vocational expert.  *Id*.

### 1.    Weight Accorded to Opinion Evidence

Plaintiff asserts the ALJ erred by affording "little weight" to the opinions of Drs.

Silversteen and Fucci, while giving substantial weight to the opinions of the non-

examining medical consultants.  D.I. 12 at 16.  A cardinal principle guiding disability

eligibility determinations is that the ALJ accord treating physicians' reports great weight,

especially "when the opinions reflect expert judgment based on a continuing observation

of the patient's condition over a prolonged period of time."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  Such reports will be afforded controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on record.  *Fargnoli*, 247 F.3d at 43.

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.  *Morales*, 255 F.3d at 317 (citing *Plummer*, 186 F.3d at 429).  It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record. SSR 96-2p, 1996 WL 374188 at *2.  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."  *Plummer*, 186 F.3d at 429.  Further, medical testimony from a doctor who has never examined the claimant should not be given credit if it contradicts the testimony of the claimant's treating physician.  *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986).

If the ALJ does not give a physician's report controlling weight, he must examine multiple factors.  20 C.F.R. § 404.1527(c).  These factors include the "[e]xamining relationship," the "[t]reatment relationship" which considers the "[l]ength of the treatment relationship and the frequency of examination," the "[n]ature and extent of the treatment relationship," the degree and extent the relevant evidence supports a treating physician's opinion, the consistency of the opinion with the record as a whole, and the

21

specialization of the treating physician in relation to the medical issues involved.  *Id.*  An ALJ must weigh all the evidence in the record.  *Burnette v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).  Failure of an ALJ to examine and elaborate on these factors is grounds for remand.  *Solomon v. Colvin*, C.A. No. 12–1406–RGA–MPT, 2013 WL 5270302, at *12 (D. Del. Oct. 22, 2013).

### a.    Drs. Silversteen and Fucci

The ALJ did not properly weigh the medical findings of Drs. Silversteen and Fucci.  The ALJ assigned little weight to Dr. Silversteen because he had seen plaintiff on "limited occasions" and "there [were] no indications in his treatment notes that Ms. Seney ha[d] such restricted functioning as the doctor" assessed.  D.I. 9 at 36.  The ALJ failed to appropriately examine and elaborate upon the elements of 20 C.F.R. § 404.1527(c), therefore the matter should be remanded.  *Solomon*, 2013 WL 5720302, at *12.

Dr. Silversteen treated plaintiff seven times over a two year period.  D.I. 9 at 398-405, 423-30, 438-41, 446-49, 458-65, 500-07, 529-32, 539-46.  Additionally, he examined multiple MRIs during this time which showed continued progression of plaintiff's MS.  D.I. 9 at 398-99, 467-72, 500-01.  The evidence does not support the ALJ's finding that Dr. Silversteen only saw plaintiff on limited occasions.

Dr. Silversteen's opinions were based on his exams showing bilateral temporal pallor with the right greater than left, pathologically brisk reflexes throughout but increased in the left upper and lower extremities compared to the right, upgoing toes bilaterally, decreased temperature in all four extremities, mild sway revealed on Romberg testing, and twenty-five foot gait in 9.1 seconds.  *Id.* at 400, 404, 425, 429,

22

440, 448, 460, 464, 503, 531.  The ALJ found that there were no indications in Dr.
Silversteen's treatment notes to support his opinions, but the objective evidence refutes
this conclusion.  The ALJ failed to examine the factors from 20 C.F.R. § 404.1527(c).
Notably, 20 C.F.R. § 404.1527(c)(5) states "[the ALJ] generally give[s] more weight to
the opinion of a specialist . . . than to the opinion of a source who is not a specialist."
Dr. Silversteen is a neurologist with an established treating relationship with plaintiff,
which makes him uniquely qualified to interpret the significance of his findings and the
MRI results as they relate to plaintiff's functional limitations.

Further, Dr. Silversteen's opinion was consistent with Dr. Fucci's medical source
statement completed on October 25, 2012.  D.I. 9 at 473-78, 488-93.  Dr. Fucci has
been treating plaintiff since the 1990's.  *Id.* at 237.  The ALJ assigned little weight to Dr.
Fucci's opinion because it was "not accompanied with treatment notes" in support, but
Dr. Fucci's treatment records, which are part of the record below, note loss of hair,
weight loss, weakness, use of a cane, and other physical symptoms supporting his
medical source statement.  *Id.* at 36.  The ALJ's reasoning ignores the extensive
treatment relationship Dr. Fucci shares with plaintiff, and fails to elaborate on the other
factors of § 404.1527(c).

### b.    State Agency Medical Consultants

The ALJ assigned "substantial weight" to the opinions of the state agency
medical consultants because the consultants were "highly qualified physicians who are
also experts in Social Security disability evaluation," and the opinions were "consistent
with the totality of the medical evidence" in the record.  *Id.* at 36.  First, the state agency
medical consultant opinions directly contradicted the treating physicians' opinions, so

23

the opinions were clearly not consistent with the totality of the medical evidence.

Additionally, the ALJ failed to elaborate on the factors of § 404.1527(c) when assigning

substantial weight to the state agency consultants.  Dr. Goldsmith's report contains

minimal support for her opinion.[6]  D.I. 9 at 415-21.  All three non-examining physicians

were internal medicine specialists, which generally entitles their opinions less weight

than Dr. Silversteen's opinion, who specializes in neurology and has an established

treating relationship with plaintiff.  *Id.* at 421, 437, 487; 20 C.F.R. § 404.1527(c)(5).  The

matter should be remanded for the ALJ to further elaborate upon the elements of 20

C.F.R. § 404.1527(c) regarding appropriate weight afforded to treating and non-treating

physicians' medical opinions.

>   **2.      Credibility Assessment**

Plaintiff argues the ALJ erred in evaluating the credibility of her subjective

complaints.  D.I. 12 at 18-21.  The ALJ must follow a two-step process for evaluating

symptoms.[7]  SSR 96-7p (S.S.A.), 1996 WL 374186, at *2.  First, the ALJ "must consider

whether there is an underlying medically determinable physical or mental impairment

. . . that could reasonably be expected to produce the individual's pain or other

symptoms."  *Id.*  Second, the ALJ must "evaluate the intensity, persistence, and limiting

effects of the individual's symptoms to determine the extent to which the symptoms limit

the individual's ability to do basic work activities."  *Id.*  Under this evaluation, a variety of

---

[6]*See* 20 C.F.R. § 404.1527(c)(5). "[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions."
[7]"Symptom" is defined as "an individual's own description of his or her physical or mental impairments."  SSR 96-7p, at *1.

factors are considered, such as: (1) "objective medical evidence," (2) "daily activities," (3) "location, duration, frequency, and intensity," (4) "type, dosage, effectiveness, and side effects of any medication," (5) treatment (other than medication), (6) and "other factors" concerning plaintiff's limitations.  20 C.F.R. § 404.1529(c).

In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence depends on his/her credibility.  SSR 96-7p, at *4. When evaluating a claimant's credibility, the ALJ must consider the entire case record and give specific reasons for the weight given to the individual's statements.  *Id.*  A strong indication of credibility is consistency, including the consistency of an individual's own statements, and with other information in the case record.  *Id.* at *5.  Additionally, an individual's statements may be less credible if the record shows the individual did not follow the treatment as prescribed.  *Id.* at *7.  In making a finding about the credibility of a claimant's statements, the adjudicator need not totally accept or reject them, and may find some statements to be partially credible.  *Id.* at *4.

Here, the ALJ confirmed plaintiff's MS diagnosis, but found her credibility diminished due to "the conservative nature of her medical care, the limited objective medical findings, and [her] admitted [daily] activities."   D.I. 9 at 36.  The ALJ noted plaintiff was totally independent in all daily living activities, which include caring for the needs of her five children and her personal activities while her children are at school. *Id.*  Plaintiff testified she was unable to drive due to vision problems, but the objective medical records from her treating opthamologist show she was able to drive from 2011 to 2013.  *Id.*  Further, the ALJ noted plaintiff "was non-compliant with medical treatment in many instances."  *Id.*  Plaintiff stopped taking Cellcept as prescribed without first

25

checking with her treating physician, and refused both Gilenya and IV steroids, as recommended by her treating physician.  *Id.* at 36, 500-01, 503.  Plaintiff's most recent medical records reflected her MS was quiescent and she was feeling well, but during the hearing, she testified her symptoms were disabling.  *Id.* at 36, 555, 572.  Her impairments also have not warranted hospitalization or emergency room treatment since the disability onset.  *Id.*  The ALJ's decision to view plaintiff's testimony with diminished credibility should be upheld because it was supported by sufficient evidence.

### 3.    Consideration of New Evidence

Plaintiff requests the court remand pursuant to sentence six of 42 U.S.C. §405(g) based on records submitted to the Appeals Council after the ALJ's decision.  D.I. 12 at 22-23.  To succeed with a 42 U.S.C. § 405(g) claim, a claimant must show there is "new" and "material" evidence not presented to the ALJ, and there was good cause for failing to incorporate the evidence into the record in the prior proceeding.  42 U.S.C. § 405(g); *Matthews v. Apfel*, 239 F.3d 589, 593 (3d. Cir. 2001).  For evidence to be new, it must not merely be "cumulative of what is already in the record."  *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3rd Cir. 1984).  For evidence to be material, it must be "relative and probative."  *Id.*  The materiality standard requires "that there be a reasonable possibility that the new evidence would have changed the outcome" of the ALJ's determination.  *Id.*  "An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of later-acquired disability or of the subsequent deterioration of the previously non-disabling condition."  *Id.*

Here, the evidence submitted to the Appeals Council is not material, because it

26

relates plaintiff's condition as it existed after the date of the ALJ's decision, and fails to demonstrate disabling functional limitations during the relevant period.  The MRI taken one month after the ALJ's decision showed some new lesions, but otherwise is stable with no active demyelinating plaque.  D.I. 9 at 591-94.  Plaintiff's physical examinations from the relevant period revealed her neck flexion and extension as normal, and she had normal muscle strength throughout.  *Id.* at 34-35.  Further, the two additional cervical MRIs submitted were performed a year after the relevant period, so there is no reasonable possibility the evidence would have changed the ALJ's decision.  *Id.* at 7-10.

The urology report dated October 2014 occurred 16 months after the ALJ's decision.  *Id.* at 11-17.  It fails to demonstrate disabling urinary problems during the relevant period.  Additionally, the ALJ accounted for plaintiff's bladder problems that were supported by the record, by finding she would need ready access to a bathroom.  *Id.* at 33.  The ophthalmology report, dated September 2014, also fails to demonstrate disabling limitations during the relevant period.  *Id.* at 18-19.  The ALJ accounted for plaintiff's eye problems as supported by the record, by finding she needed a job that did not require keen visual acuity.  *Id.* at 32-33.  The new evidence submitted to the Appeals Council should not be considered on remand since it fails to meet the requirements of 42 U.S.C. § 405(g).

## V.    CONCLUSION

Consistent with the findings contained in the Report and Recommendation,

IT IS RECOMMENDED that:

(1) Plaintiff's motion for summary judgment (D.I. 11) be granted in part and denied in part;

(2) Defendant's motion for summary judgment be (D.I. 15) be granted in part and denied in part; and

(3) The matter be remanded to the ALJ for further elaboration consistent with this opinion.

Pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72 (b)(1), and D. DEL. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same.  Any response shall be limited to ten (10) pages.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov.)


Date: May 5, 2016                                      /s/ Mary Pat Thynge
                                                       United States Magistrate Judge